1

2

3

4

5

6

7       IN THE UNITED STATES DISTRICT COURT FOR THE

8              EASTERN DISTRICT OF CALIFORNIA

9

10   EDWARD COLSON,                    )    1:10-CV-1776  AWI JLT
                                       )
11              Plaintiff,             )
       v.                             )    ORDER ON DEFENDANTS'
12                                     )    MOTION FOR SUMMARY
     CITY OF BAKERSFIELD, DENNIS       )    JUDGMENT
13   PARK, CHARLES WRIGHT, and         )
     DOES 3 to 100, inclusive,         )
14                                     )
                Defendants.            )
15   _____)

16

17
         This case arises from an encounter between Plaintiff Edward Colson ("Colson") and
18
     members of the City of Bakersfield Police Department ("the City"), including Defendants Dennis
19
     Park ("Park") and Charles Wright ("Wright").  Colson contends that he suffered injuries when
20
     City police officers dragged him along the ground while handcuffed in the course of a search of
21
     his pick up truck.  Colson brings twelve causes against the Defendants, including claims under
22
     42 U.S.C. § 1983 and claims under California common and statutory law.[1]  Defendants now
23
     move for summary judgment on all claims.  For the reasons that follow, Defendants' motion will
24
     be granted in part and this case will be dismissed.
25

26
         _____
27      [1]Colson alleges four causes of action under 42 U.S.C. § 1983 for excessive force, seizure without probable
     cause or reasonable suspicion, deliberate indifference to medical need, and conspiracy, all in violation of either the
     Fourteenth or Fourth Amendments.  Colson alleges state common law claims for assault, battery, false imprisonment,
28   conversion/trespass to chattels, intentional infliction of emotional distress, negligence, and conspiracy.  Finally,
     Colson alleges a claim under California Civil Code § 52.1.

1

**FACTUAL BACKGROUND**[2]

2      In the early morning hours of January 11, 2010, Colson was awakened by Mandi Patton

3 ("Patton").  See PUMF 3.  Colson and Patton were both staying the night at a mutual friend's

4 home following a day of watching football.  See PUMF 2.  After several requests, Patton

5 eventually convinced Colson to take her to talk to her boyfriend Donnie Lee ("Lee"), who was

6 Colson's roommate.  See PUMF's 1, 3.  Colson and Patton drove in Colson's gray truck to see

7 Lee.[3]  See PUMF 3.  At Lee's house, Colson stayed in his truck while Patton attempted to talk to

8 Lee.  See PUMF 4.  Lee would not let Patton inside, and she eventually returned to Colson's

9 truck and they drove away.  See id.  Unknown to Colson and Patton, Lee called the City Police

10 Department and reported that there was a man with a gun driving a gray truck.  PUMF 5.

11      Apparently after Lee's report, see id., several City police officers, including Park and

12 Wright, were informed via a radio broadcast that Colson had just left his residence and was in

13 possession of a firearm.  See DUMF's 1, 2.[4]  While on patrol, Park and Wright observed a gray

14 pick up truck (Colson's) pass them, and the truck matched the description given to them on the

15 radio.  See DUMF's 3, 4.  Park and Wright activated their emergency lights, which resulted in

16 Colson stopping his vehicle on the side of the road.  See DUMF's 5, 6; PUMF 7.

17      After they pulled Colson's vehicle over, Park and Wright parked a distance away and

18 waited for back-up.  PUMF 7.  When other back-up City police officers arrived, they surrounded

19 the truck with their lights shining at the truck.  See id.  City police officers drew their weapons.

20 See id.  Over a loud speaker, a City police officer gave instructions to Colson.[5]  PUMF 8.

21

22      [2]"DUMF" refers to Defendants' Undisputed Material Facts, and "PUMF" refers to Plaintiff's Undisputed

23 Material Facts.  Additionally, the parties make numerous objections to various pieces of evidence.  Unless otherwise noted, to the extent that the Court utilizes a fact or evidence to which there is an objection, the objection is overruled.

24      [3]The gray truck was actually owned by Raymond Tapia, not Colson.  DUMF 25.  Shortly after January 2010, the gray truck was repossessed.  See DUMF 26.

25

26      [4]Colson denies DUMF 2 by stating that he did not have a firearm.  In fact, there are several DUMF's to which Colson responds that he did not have a firearm.  However, there is no DUMF that asserts that Colson actually

27 had a firearm.  Therefore, the response that Colson did not have a firearm disputes nothing.  All DUMF's that are "disputed" in this fashion are deemed undisputed.

28      [5]Although Colson apparently is unable to identify the officer who gave him instructions over the loud speaker, Wright's deposition indicates that Park gave the instruction.  See Wright Depo. 24:17-22.

2

Believing that Colson had a gun, the officers commanded Colson to throw his keys out of the driver side window and get out of the vehicle. DUMF 6. Colson complied with these orders. <u>See</u> PUMF 8. Colson saw that officers had pistols and shotguns out and pointed at him/his truck. <u>See</u> Colson Depo. at 54:7-16; <u>see also</u> Wright Depo. 30:2-13.

After Colson got out of the truck and put his hands up, officers asked Colson to walk backwards towards the them so that they could see him at all times. DUMF 7. Officers ordered Colson to get on his knees. PUMF 9. Colson told the officers that due to his weight and size, he would have difficulty complying with their requests. <u>Id.</u> Colson is over 6' 4" and, at the time, weighed about 450 lbs. <u>See</u> PUMF 10. Although Colson had difficulty, he eventually got on his knees with his hands in the air. <u>See</u> PUMF 11. Officers then came from behind to handcuff him. PUMF 12. Before being handcuffed, Colson told the officer to please use two pairs of handcuffs due to his size. <u>See</u> PUMF 13; Colson Depo. 63:8-64:12. Colson asked the officers twice to use two sets of handcuffs, but the officers never responded. <u>See</u> Colson Depo. 63:8-64:12. Instead, officers handcuffed Colson with one set of handcuffs. <u>See</u> PUMF 13; Colson Depo. 66:3-6.

Once handcuffed, officers instructed Colson to stand up. PUMF 14. Colson told the officers that he would have more difficulty getting up because of his weight and because he could no longer use his hands to support himself up. <u>Id.</u> An officer tried to help Colson up by lifting Colson's hands or arms up, but even with the officer lifting and Colson trying to get his legs underneath him, Colson could not get up and the officer became agitated. <u>See</u> Colson Depo. 67:20-69:9. After the officer attempted to lift Colson a second time, Colson began to experience pain in his right shoulder and wrist. <u>See id.</u> at 69:25-70:6. Another officer then came from behind Colson and grabs hold of Colson's left forearm. <u>See id.</u> at 70:7-10. One of the officers then told Colson, "If you don't get up, we're going to drag you." <u>Id.</u> at 70:16-20. The two officers then started to pull on Colson's arm and the handcuffs. <u>See id.</u> at 70:22-25. When the officers pulled, Colson experienced "excruciating" pain in his shoulder. <u>See id.</u> at 71:13-23. Colson screamed in pain. <u>See id.</u> at 73:12; Patton Dec. ¶ 10. The officers "dragged" Colson approximately two car lengths to a police vehicle, where Colson sat on the bumper. <u>See</u> Colson Depo. 78:4-11. By "dragging," Colson described that there were alternating periods of him

1    trying to get his legs up underneath him, and his knees hitting the ground.  See id. at 75:19-23.

2           Patton was ordered out of the truck, was handcuffed, and taken to the back of a police

3    vehicle.  See Patton Dec. ¶ 12.  Patton counted approximately 8 police vehicles and 12 officers

4    on the scene.  See id. at ¶ 13.  Officers then began searching Colson's truck.  See Colson Depo.

5    81:1-21; DUMF 13.  As officers searched the truck, Colson repeatedly asked an officer who was

6    standing next to him what was going, but Colson never received a response.  See Colson Depo. at

7    82:12-21.  As the truck was being searched, officers also searched Colson's person.  See id. at

8    82:22-84:12.

9           No weapons were found and there were no warrants outstanding for either Patton or

10   Colson, so the officers released Colson within approximately 20 minutes of the stop.  See DUMF

11   14.  An officer told Colson that there had been a mistaken identity and that he was free to go.

12   See Colson Depo. 85:13-25.  An officer also informed Colson that the police had received an

13   anonymous report that a man in truck had a gun.  See PUMF 21; Patton Dec. ¶ 16.  Later, Colson

14   requested officer assistance in going back to his residence (presumably Lee's home) so that he

15   could pick up his possessions, and an officer escorted Colson back to the residence.  DUMF 15.

16          Colson did not request medical care at the search scene.  See PUMF 24; see also DUMF

17   22.  However, a couple of hours following the stop, Colson attempted to go to work but his right

18   arm was in too much pain.  PUMF 26.  Colson consulted a doctor that day and the doctor

19   diagnosed him with injuries to his right shoulder.  PUMF 28.  Colson's knees were also skinned

20   and/or bloodied while the officers dragged him, and Colson later showed Patton that his knees

21   were bruised.  See Colson Depo. 75:22-76:8; Patton Dec. ¶ 17.

22          Aside from screaming while he was being dragged, see Colson Depo. at 73:12; Patton

23   Dec. ¶ 10, Colson never complained or advised either Park or Wright that he was injured or

24   experiencing any pain at the scene.  See DUMF 20.  Colson never asked Park or Wright for

25   medical care or an ambulance at any time, nor did he request medical care or an ambulance from

26   Defective Eddy, who accompanied Colson back to his residence following the stop.  See DUMF

27   22.  Detective Eddy never heard Colson make any complaints about being injured or having any

28   pain whatsoever.  See DUMF 21.

1    Park did not handcuff Colson, does not know who handcuffed Colson, and did not have

2    any physical contact with Colson.  See Park Depo. 23:3-6, 28:22-25; Park Dec. ¶ 2.  Although

3    Park testified that Colson was placed in the back of a police vehicle, he testified that he does not

4    know who placed Colson in the vehicle.  See id. at 24:7-16.  Park testified that he spoke to and

5    obtained information from Colson, including informing Colson of the reason for the stop, and

6    also questioned Patton.  See id. at 26:4-28:7; see also Park Dec. ¶ 3.  Wright did not handcuff

7    Colson, does not know who handcuffed Colson, and had no physical contact with Colson.  See

8    Wright Depo. 37:1-6; Wright Dec. ¶ 2.  Wright's involvement at the scene was focusing on the

9    passenger in the truck and searching the truck.  See Wright Depo. 37:4-6, 40:8-14; Wright Dec. ¶

10   3.

11   Neither Park nor Wright have final policy making authority, nor are they authorized final

12   decision makers for the City.  See DUMF 23.  Park and Wright have declared that they have not

13   discussed or entered into any agreement to violate Colson's civil rights.  See  DUMF 24.

14   However, officers minimized the nature of Colson's stop.  PUMF 25.  In his report, Park omitted

15   that: (1) this was a felony stop;[6] (2) several officers responded, not just Park and Wright; (3)

16   Colson was told to exit his vehicle at gun point; (4) Colson was handcuffed; (5) Colson was

17   dragged several feet; (6) Colson was in pain; (7) how information was dispatched to patrol units

18   in the field; (8) whether a supervisor was present; (9) the length of the detention; and (10) any of

19   the circumstances regarding Lee's false report.  See id.; Clark Dec. ¶ 29; cf. Park Depo. Ex. 2.

20

21                        **SUMMARY JUDGMENT FRAMEWORK**

22   Summary judgment is appropriate when it is demonstrated that there exists no genuine

23   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

24   Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

25   American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

26   judgment bears the initial burden of informing the court of the basis for its motion and of

27

28        [6]Park and Wright at their depositions referred to the stop as a "felony stop."  See Park Depo. at 39:24;
     Wright Depo. at 26:2-8.

                                          5

identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114 (9th Cir. 2009).  A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson, 477 U.S. at 248; Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim.  See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984.  If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000) If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

The opposing party's evidence is to be believed, and all justifiable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010).  While a "justifiable inference" need not be the most likely or the most

persuasive inference, a "justifiable inference" must be rational or reasonable.  See Narayan, 616 F.3d at 899.  Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  Nissan Fire, 210 F.3d at 1103.

Finally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to comb through the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Simmons v. Navajo County, 609 F.3d 1011, 1017 (9th Cir. 2010); Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1058 (9th Cir. 2009).

## DEFENDANTS' MOTION

As noted above, Colson has brought twelve causes of action against the Defendants.  The Court will address the causes of action separately, and will also assess the City's *Monell* liability separately from the federal claims against the individual officers.

### I.  First Cause of Action – § 1983 – Excessive Force

*Defendants' Argument*

Defendants state that liability under § 1983 is personal as to each defendant.  Because they had no physical contact with Colson, Park and Wright argue that they cannot be liable.

1    *Plaintiff's Opposition*

2         Colson argues that the evidence shows that excessive force was used against him, and

3    that the force caused injury to his shoulder.  Although he cannot identify which specific officers

4    used force against him, Colson argues that Park and Wright were present when the force was

5    used.  Under Ninth Circuit precedent, the is sufficient evidence to support reasonable inferences

6    that Park and Wright used excessive force against him.

7    *Legal Standard*

8         "A person subjects another to the deprivation of a constitutional right, within the meaning

9    of [42 U.S.C. § 1983], if he does an affirmative act, participates in another's affirmative acts, or

10   omits to perform an act which he is legally required to do that causes the deprivation of which

11   complaint is made."  Preschooler II v. Clark County Sch. Bd. of Trs., 479 F.3d 1175, 1183 (9th

12   Cir. 2007); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  As such, a plaintiff cannot hold

13   an officer liable simply because of the officer's "membership in a group without a showing of

14   individual participation in the unlawful conduct."  Jones v. Williams, 297 F.3d 930, 935 (9th Cir.

15   2002); see Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005); Chuman v. Wright, 76 F.3d

16   292, 294 (9th Cir. 1996).  That is, "holding an officer liable who was merely present at the

17   [incident] is not permissible."  Jones, 297 F.3d at 939; see Motley, 432 F.3d at 1082; Lolli v.

18   County of Orange, 351 F.3d 410, 417 (9th Cir. 2003).  A plaintiff must "establish the 'integral

19   participation' of the officers in the alleged constitutional violation."  Jones, 297 F.3d at 935; see

20   Torres v. City of Los Angeles, 548 F.3d 1197, 1206 (9th Cir. 2008).  "Integral participation"

21   requires "some fundamental involvement in the conduct that allegedly caused the violation."

22   Blankenhorn v. City of Orange, 485 F.3d 463, 481 n.12 (9th Cir. 2007); see Torres, 548 F.3d at

23   1206.  Further, as long as there is sufficient evidence to permit a jury to infer that the individual

24   defendants each participated in a constitutional deprivation, the plaintiff's inability to identify

25   which defendants performed which specific acts is not fatal.  See Jones, 297 F.3d at 935-36;

26   Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir. 1986).

27   *Discussion*

28        Colson relies heavily on *Santos v. Gates*, 287 F.3d 846 (9t h Cir. 2002) and *Rutherford* to

1   argue that there is sufficient evidence for a jury to infer Park's and Wright's personal

2   participation in handcuffing and dragging him to a police vehicle.  Both *Santos* and *Rutherford*

3   were cases in which the plaintiffs were not able to clearly identify which defendants actually

4   caused the constitutional injury at issue.  The Court finds *Santos* and *Rutherford* to be

5   distinguishable from the case at bar.

6         In *Santos*, the plaintiff Santos sought recovery against two Los Angles police officers for

7   excessive force.  See Santos, 287 F.3d at 850.  Santos had "no clear recollection" of the act

8   which he contended caused him severe physical injury.  See id. at 851.  However, the two police

9   officers admitted to taking Santos to the ground, handcuffing him, and "forcibly immobilizing"

10  him.  See id. at 852.  Further, Santos stated that he experienced extreme pain, shouted at the

11  officers "why did you have to break my back," and a defense expert testified that Santos's

12  injuries were consistent with being violently shoved to the ground.  See id.  The Ninth Circuit

13  held that this evidence was sufficient circumstantial evidence that could support a recovery

14  against the two officers.  See id.

15        In *Rutherford*, the plaintiff Rutherford sought recovery against three Berkeley police

16  officers.  See Rutherford, 780 F.2d at 1445.  Rutherford could not specifically state whether the

17  individual defendants punched or kicked him.  See id. at 1448.  However, Rutherford did testify

18  that the three defendant officers were among the five or six officers who were surrounding him

19  while he was beaten, and that he was able to see each of the three defendants' faces while he was

20  being beaten.  See id.  Further, the three defendant officers admitted that they were among the

21  five or six officers who detained, arrested, and handcuffed Rutherford, but denied punching or

22  kicking him.  See id.  The Ninth Circuit held that this was sufficient to permit a jury to

23  reasonably infer that the three defendants were participants in the punching and/or kicking of

24  Rutherford.  See id.

25        In the case at bar, Colson has only shown that Park and Wright were present at the scene

26  when Colson was handcuffed and dragged.  In *Santos*, the two officers admitted to forcibly

27  immobilizing Santos.  See Santos, 287 F.3d at 851-52.  Here, in contrast, Park and Wright have

28  declared without contradiction that they had no physical contact with Colson.  See Park Dec. ¶ 2;

Wright Dec. ¶ 2.  In *Rutherford*, the plaintiff was able to testify that he saw the three defendants'
faces among the group of officers as he was being beaten.  See *Rutherford*, 780 F.2d at 1448.
Here, in contrast, Colson has pointed to no evidence that tends to identify Park or Wright as the
officers who cuffed and dragged him.  Unlike *Santos* and *Rutherford*, there is no evidence that
provides a circumstantial link between the force used against Colson and the participation of
Park and Wright in that force.

Colson has provided no link between Park and Wright and the handcuffing and dragging.
Instead, Colson has shown only that Park and Wright were generally present at the scene.  This is
insufficient to show personal participation.  See <u>Motley</u>, 432 F.3d at 1082; <u>Lolli</u>, 351 F.3d at 417;
<u>Jones</u>, 297 F.3d at 936, 939.  Summary judgment in favor Park and Wright on this cause of
action is appropriate.

## II.  Second Cause of Action – § 1983 – Reasonable Suspicion & Probable Cause

### *Defendants' Argument*

Defendants argue that Colson was never arrested or charged with any crime, but he was
detained.  The detention was justified until a search of his person and vehicle could be
conducted.  The officers had reason to believe that Colson might be in possession of a gun and it
was necessary that he be detained for officer and public safety.  As soon as it was determined that
Colson had no gun, he was released and the entire detention lasted no more than 20 minutes.
Detaining Colson was reasonable under the circumstances.

### *Plaintiff's Opposition*

Colson argues that there are material facts that show that he was detained without
probable cause.  Officers detained him in response to an anonymous tip that he was allegedly
carrying a gun.  However, no gun was found following the search and no charges were filed.

### *Legal Standard*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the
Government, and its protections extend to brief investigatory stops of persons or vehicles that fall
short of traditional arrest."  <u>United States v. Arvizu</u>, 534 U.S. 266, 273 (2002); <u>Ramirez v. City</u>

1   of Buena Park, 560 F.3d 1012, 1020-21 (9th Cir. 2009).  Under the Fourth Amendment, a

2   "detention or seizure of a person occurs when the officer, by means of physical force or show of

3   authority, has in some way restrained the liberty of a citizen."  United States v. Orman, 486 F.3d

4   1170, 1175 (9th Cir. 2007); Desyllas v. Bernstine, 351 F.3d 934, 940 (9th Cir. 2003).

5           "The Fourth Amendment requires police officers to have probable cause before making a

6   warrantless arrest."  Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009); see

7   Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).  "Probable cause to arrest exists

8   when officers have knowledge or reasonably trustworthy information sufficient to lead a person

9   of reasonable caution to believe that an offense has been or is being committed by the person

10  being arrested."  Rodis v. City & County of San Francisco, 558 F.3d 964, 969 (9th Cir. 2009);

11  John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008).  Courts look to "the totality of the

12  circumstances known to the arresting officers to determine if a prudent person would have

13  concluded there was a fair probability that the defendant had committed a crime."  John, 515

14  F.3d at 940; see Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006).

15          For seizures that do not amount to a full arrest, police may "detain or seize an individual

16  for brief, investigatory purposes, provided the officers making the stop have reasonable suspicion

17  that criminal activity may be afoot."  United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009)

18  see Ramirez, 560 F.3d at 1020.  "To determine whether [an investigatory] stop was supported by

19  reasonable suspicion, we consider whether, in light of the totality of the circumstances, the

20  officer had a particularized and objective basis for suspecting the particular person stopped of

21  criminal activity."  United States v. Palos-Marquez, 591 F.3d 1272, 1275 (9th Cir. 2010); see

22  Ramirez, 560 F.3d at 1021.  "The reasonable suspicion standard is a less demanding standard

23  than probable cause, and merely requires a minimal level of objective justification."  Gallegos v.

24  City of Los Angeles, 308 F.3d 987, 990-991 (9th Cir. 2002); see also Ramirez, 560 F.3d at 1020.

25          Finally, a "facially valid direction from one officer to another to stop a person or a vehicle

26  insulates the complying officer from assuming personal responsibility or liability for his act done

27  in obedience to the direction."  United States v. Robinson, 536 F.2d 1298, 1299 (9th Cir. 1976);

28  see Motley v. Parks, 432 F.3d 1072, 1082 (9th Cir. 2005).

1   *Discussion*

2       Park and Wright testified that they stopped Colson because of a radio broadcast that they

3   had received from Detective Eddy, who was a senior officer.  See Park Depo. 13:9-14:2; Wright

4   Depo. 18:9-20.  Park explained:  "Another officer had relayed information over our radio that

5   Mr. Colson had just left a residence and provided a description of the vehicle he was driving and

6   also advised that he was reported to be in possession of a firearm."  Park Depo. 13:9-19.  Wright

7   was asked whether he had received "a call to stop Mr. Colson's vehicle."  Id. at 18:9-11.  After

8   clarifying that "any type of call" was encompassed by the question, Wright testified, "It came out

9   over the radio, yes, sir."  Id. at 18:12-15.  While Wright could not remember exactly what Eddy

10  said, Wright described the radio call as indicating that "there's a subject who is supposed to have

11  a firearm and just left somewhere with a firearm, and he's in a truck, and then he provided a

12  description of this truck."  Id. at 19:3-6.  When asked if Eddy expressed a degree of urgency,

13  Wright explained: "Well, he wasn't screaming it over the radio, if that's what you mean, but

14  anytime there's supposed to be someone who as a gun, illegally has a gun, and there's . . .

15  everything's heightened and gone up."  Id. at 20:19-25.

16      Detective Eddy explained his involvement in Colson's detention as "receiving a

17  telephone call from another officer who advised me that a certain vehicle was possible - - an

18  occupant of a certain vehicle was possibly armed with a firearm and off to a certain location."

19  Eddy Depo. 14:18-22.  In response to the information that he received, Eddy sent out a radio

20  broadcast.  See id. at 18:3-7.  While Eddy could not remember specifics, he described his radio

21  broadcast:  "I . . . put out a vehicle description that was given at the time and that it was en route

22  to a certain area of town, for officers to keep an eye out, as I believed that it was an officer safety

23  issue with the firearm in the vehicle."  Id. at 18:9-13.  After broadcasting, Eddy began driving to

24  the location where the gray truck was said to be going.  See id. at 19:6-20.  Eddy also listened to

25  radio traffic and was looking for the gray truck as he drove.  See id.  Eddy later arrived at the

26  scene where Colson's truck had been stopped in response to his radio broadcast.  See id. at

27  19:24-20:4.

28      The above testimony indicates that the radio broadcast was one for other officers to stop

Colson's truck.  Wright testified that officers had received a radio call to stop Colson's gray truck.  Eddy's testimony shows that he told officers to "keep an eye out" for the truck, that he himself was searching for Colson's truck, and that he was listening for radio traffic about the truck.  Also, when the stop was made in response to the radio broadcast, Eddy arrived and other officers arrived within 30 seconds to 2 minutes.  See Eddy Depo. 19:24-20:4; Wright Depo. 25:4-26:3.  These facts show that the radio broadcast was meant to inform officers of an armed individual in a gray truck heading towards a particular part of town, and that the driver of that truck was to be detained.

It is true that Park's and Wright's respective descriptions of the radio broadcast does not reveal the presence of a crime.  Generally speaking, it is legal for a citizen to possess a firearm and to transport a firearm in a vehicle.  Thus, the content of the broadcast alone did not provide either probable cause or reasonable suspicion to detain Colson.  However, Eddy was a senior officer and there is no evidence that his broadcast to stop Colson's gray truck was facially invalid.  Because Colson's detention was pursuant to a facially valid radio broadcast from a senior officer to stop the gray truck, Park and Wright are not liable for stopping Colson's truck and detaining him.[7]  See Motley, 432 F.3d at 1082; Robinson, 536 F.2d at 1299.

Summary judgment in favor of Park and Wright on this claim is appropriate.


### III.  Third Cause of Action – § 1983 – Deliberate Indifference To Medical Need
*Defendants' Argument*

Defendants argue that there is no basis for concluding that they did not render medical care or that they were deliberately indifferent to Colson.  Park spoke to and questioned Colson, and Wright had no contact with Colson.  At no time did Colson ever request that Park or Wright provide medical care or summon an ambulance.  Further, Detective Eddy confirmed that Colson did not request medical care or an ambulance during the trip to Colson's residence.

---

[7]The Court notes that Colson's expert, Roger Clark, indicated that he was retained to review the "facts and circumstances surrounding the detention, pull-over, [and] use of force on Edward Colson."  Clark Dec. ¶ 2.  Clark generally criticizes the use of force against Colson.  See id. at ¶ 26.  However, despite reviewing the "pull-over," Clark offers no opinions that the pull over/initial detention of Colson was improper.  See id. at ¶¶ 2, 26-36.

13

1

_Plaintiff's Opposition_

2       Colson argues that, after being handcuffed and dragged, the Defendants purposefully

3   ignored his pain.  While he did not expressly request medical care, his screams of pain indicated

4   that he was in need of medical care.  The officers were deliberately indifferent to that need.

5       _Discussion_

6       Colson brings this claim under the Fourteenth Amendment.  The Supreme Court has held

7   that the Fourteenth Amendment requires police departments "to provide medical care to persons .

8   . . who have been injured while being apprehended by the police."  Revere v. Massachusetts Gen.

9   Hosp., 463 U.S. 239, 244 (1983).  For a pre-trial detainee to recover for inadequate medical care

10  under the Fourteenth Amendment, the pre-trial detainee must show _inter alia_ deliberate

11  indifference to his medical needs.  Lolli v. County of Orange, 351 F.3d 410, 418 (9th Cir. 2003).

12  Under the deliberate indifference standard, a defendant will be liable for denying needed medical

13  care only if he "knows of and disregards an excessive risk to [a detainee's] health and safety."

14  Id.  "In order to know of the risk, it is not enough that the person merely be aware of facts from

15  which the inference could be drawn that a substantial risk of serious harm exists, [] he must also

16  draw that inference."  Id. at 419.  However, the Ninth Circuit has indicated that the Fourth

17  Amendment's objective reasonableness standard applies to claims of deficient medical care for

18  those who were injured while being apprehended.  Tatum v. City & County of San Francisco,

19  441 F.3d 1090, 1098-99 (9th Cir. 2006); see also Von Haar v. City of Mt. View, 2011 U.S. Dist.

20  LEXIS 19789, *6-*8 (N.D. Cal. Mar. 1, 2011).  The parties do not discuss _Tatum_ or the Fourth

21  Amendment with respect to this cause of action.  However, in light of the evidence presented,

22  under either the Fourth Amendment or the Fourteenth Amendment, there are problems with

23  Colson's claim.

24       The only evidence that Colson cites in his opposition is that he screamed at some point

25  while he was being dragged to a patrol car.  However, the evidence following the screaming is

26  highly important.  Colson was taken to a patrol car where he was searched and asked questions.

27  There is no evidence that he was unable to cooperate or that he continued to scream.  Colson

28  never requested an ambulance, and, despite interacting with officers, he never told any officer

1   that he was injured, in pain, or required medical assistance.  That is, following a scream of

2   unknown duration, Colson interacted, conversed, and cooperated with officers without difficulty

3   or signs of medical distress.  Further, when Colson was uncuffed and allowed to leave, he had no

4   problem requesting police assistance so that he could safely retrieve property from his residence.

5   There is no evidence that Colson mentioned any pain or the need for medical care at the time of

6   this request.  Relatedly, when Detective Eddy accompanied Colson back to the residence, there is

7   no evidence Colson expressed a need for medical care to Detective Eddy, nor is there evidence

8   that Colson behaved as if he required medical care in front of Eddy.

9        Generally, if police officers promptly summon an ambulance or take the injured person to

10   a hospital, the officers' conduct will be reasonable under the Fourth Amendment.  See Tatum,

11   441 F.3d at 1198-99.  However, this is not a case where medical assistance was obviously

12   needed.  For example, the officers did not shoot Colson with a firearm, nor did Colson appear to

13   exhibit signs of distressed breathing or narcotics consumption, as did the plaintiff in Tatum.  Cf.

14   id.  At best, the evidence objectively shows temporary pain that ended upon reaching the patrol

15   car.  Given Colson's interactions with officers following the dragging, the absence of additional

16   signs of a medical need or continued distress, and Colson's failure to request any medical care,

17   there was nothing to indicate that Colson required medical attention.  That is, there is insufficient

18   evidence that would objectively place Park or Wright on notice that Colson needed medical care.

19   In the absence of additional evidence, it was objectively reasonable to not obtain medical care.

20        In terms of the Fourteenth Amendment, the evidence does not indicate deliberate

21   indifference.  Park's description of his interactions with Colson does not indicate that he knew

22   that Colson was in physical distress.  See Park Depo. 26:4-28:7, 30:15-31:9; Park Dec. ¶¶ 2, 3.

23   Wright's testimony indicates that he neither focused on nor interacted with Colson.  See Wright

24   Depo. 37:4-6, 40:8-14; Wright Dec. ¶ 3.  Colson has produced no evidence that either Park or

25   Wright actually knew that Colson required medical attention.  See Lolli, 351 F.3d at 418-19.

26        Because the evidence does not indicate either deliberate indifference or objectively

27   unreasonable conduct by Park or Wright, summary judgment on this claim, under either the

28   Fourth Amendment or the Fourteenth Amendment, is appropriate.

**IV.  Fourth Cause of Action – § 1983 – Conspiracy**

*Defendants' Argument*

Defendants argue that there is no actionable conspiracy claim.  There is no evidence of an agreement/meeting of the minds, and Park and Wright categorically deny that the existence of any such agreement.  Further, there is no evidence that any of Colson's rights were actually violated as a result of any agreement.

*Plaintiff's Opposition*

Colson argues that the officers engaged in a collective agreement to minimize the nature of the stop and the actions taken against him at the scene.  The report filed by the officers omitted many key facts, including the force used and the number of officers present.  Further, although Defendants argue in this motion that Colson's stop was an "investigatory stop," the officers repeatedly referred to it as a "felony stop" in their depositions.

*Legal Standard*

A conspiracy is "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another . . . ."  Vieux v. E. Bay Reg'l Park Dist., 906 F.2d 1330, 1343 (9th Cir. 1990).  A plaintiff may seek recovery for a conspiracy under 42 U.S.C. § 1983.  See Klingele v. Eikenberry, 849 F.2d 409, 413 (9th Cir. 1988).  The elements of a conspiracy cause action under § 1983 are: "(1) the existence of an express or implied agreement among the defendant officers to deprive [the plaintiff] of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement."  Avalos v. Baca, 596 F.3d 583, 592 (9th Cir. 2010); Ting v. United States, 927 F.2d 1504, 1512 (9th Cir. 1991).  The agreement or "meeting of the minds" between the defendants "need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants."  Crowe v. County of San Diego, 608 F.3d 406, 440 (9th Cir. 2010); Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).  "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy."  Crowe, 608 F.3d at 440; Mendocino, 912 F.3d at 1302.

*Discussion*

There are problems with this cause of action.

First, there is insufficient evidence of an agreement/meeting of the minds to violate Colson's constitutional rights.  Park and Wright each declare that they did not have discussions about violating, or entering into any agreements to violate, Colson's constitutional rights.  See Park Dec. ¶ 5; Wright Dec. ¶ 6.  Colson relies exclusively on the police report that was filed in this matter.  The report is a "street check," it was not a "general offense report."  See Park Depo. 36:3-18;[8] Park Depo. Ex. 2.  Park indicated that the filing of a street check is optional, not mandatory.  See id. at 37:3-12.  Of critical importance, the report was created by Park only, it was not created by Wright.  See Park Depo. 36:25-37:2; see also Clark Dec. ¶ 29 (referring to the street check as "Officer Park's report").  There is no evidence that Wright conspired to either file the report or to omit key facts and details therefrom.  Admittedly, some of the omissions from the report and the picture that is painted is in marked contrast to Colson's version.  See Park Depo. Ex. 2.  However, without more evidence connecting the street check to Wright or some other officer, the street check shows the conduct of a single individual, it does not reflect an agreement of two or more officers.  See Ting, 927 F2d at 1512-13.

Second, a plaintiff's rights must actually be deprived as a result of the agreement.  See Avalos, 596 F.3d at 592; Ting, 927 F.2d at 1512.  Colson does not expressly address this requirement in his opposition.  However, the conspiracy described in Colson's opposition is one by the police to minimize the encounter with Colson, including the force used against him.  See Opposition 11:25-12:1.  Such a conspiracy deals with constitutional deprivations that have already occurred.  Needless to say, a constitutional deprivation that has already occurred cannot be the result of an after the fact or post-deprivation conspiracy.

Because the evidence does not show an agreement to violate Colson's rights, or an actual deprivation of rights that resulted from any agreement, summary judgment in favor of Park and Wright on this claim is appropriate.  See Avalos, 596 F.3d at 592; Ting, 927 F.2d at 1512-13.

_____

[8]The parties do not cite pages 36 and 37 of Park's deposition.  However, page 39 is cited by Colson, and that page discusses the street check.  Given Colson's reliance on the street check, the Court went back several pages in Park's deposition for further context about "street checks."

1
    **IV.  *Monell* Liability Against The City**

2
    *Defendant's Argument*

3
        The City argues that Colson has not identified any specific policy, custom or practice that

4
would make it liable under *Monell*.  Colson's discovery responses were non-specific and relied

5
on general responses.  Without a policy, custom, or practice, summary judgment is appropriate.

6
    *Plaintiff's Opposition*

7
        Colson argues that there is no evidence that officers have been retrained in the correct

8
method for restraining large individuals without using excessive force.  Correctly trained officers

9
would know that unnecessary stress from incorrect handcuff use can cause nerve damage,

10
dislocations, and fractures.  Further, reasonably trained officers would have avoided dragging a

11
suspect over the road.

12
    *Legal Standard*

13
        While a municipality is considered a "person" under 42 U.S.C. § 1983, a municipality

14
"cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality

15
cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory."  Monell v.

16
Department of Soc. Servs., 436 U.S. 658, 690-91 (1978); Long v. County of Los Angeles, 442

17
F.3d 1178, 1185 (9th Cir. 2006).  Liability only attaches where the municipality itself causes the

18
constitutional violation through "execution of a government's policy or custom, whether made by

19
its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."

20
Monell, 436 U.S. at 694.  "If no constitutional violation occurred, the municipality cannot be

21
held liable."  Long, 511 F.3d at 907 (citing City of Los Angeles v. Heller, 475 U.S. 796, 799

22
(1986)); see Gregory v. County of Maui, 523 F.3d 1103, 1109 (9th Cir. 2008).  If a constitutional

23
violation has occurred, municipal liability may be premised on: (1) conduct pursuant to an

24
expressly adopted official policy; (2) a longstanding practice or custom which constitutes the

25
'standard operating procedure' of the local government entity; (3) a decision of a decision-

26
making official who was, as a matter of state law, a final policymaking authority whose edicts or

27
acts may fairly be said to represent official policy in the area of decision; or (4) an official with

28
final policymaking authority either delegating that authority to, or ratifying the decision of, a

1   subordinate.  See Price v. Sery, 513 F.3d 962, 966 (9th Cir. Or. 2008); Lytle v. Carl, 382 F.3d

2   978, 982 (9th Cir. 2004); Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995).

3        *Discussion*

4        Although not clear, Colson appears to rely on a failure to train, or a failure to retrain,

5   officers regarding the proper methods of restraining a large individual.  To the extent that Colson

6   is relying on a failure to train, he has not identified precisely how the City's training program is

7   inadequate, or how that inadequacy led to his injuries.  See  Blankenhorn v. City of Orange, 485

8   F.3d 463, 484 (9th Cir. 2007); Long, 442 F.3d at 1186.  Instead, Colson relies heavily on the

9   events that occurred in this single case.  However, "adequately trained officers occasionally make

10  mistakes; the fact that they do says little about the training program or the legal basis for holding

11  the [municipality] liable."  City of Canton, 489 U.S. at 391.  "Mere proof of a single incident of

12  errant behavior is a clearly insufficient basis for imposing liability on the [City]."  Merritt v.

13  County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989); cf. Trevino, 99 F.3d at 918 (holding

14  that isolated or sporadic incidents are insufficient to show a "custom").

15       To the extent that Colson is attempting to show ratification based on a lack of retraining,

16  his evidence is insufficient.  To show ratification, a plaintiff must show that an "official with

17  final policy-making authority ratified a subordinate's decision or action and the basis for it."

18  Trevino, 99 F.3d at 920.  "The policymaker must have knowledge of the constitutional violation

19  and actually approve of it," and a "mere failure to overrule a subordinate's actions, without more,

20  is insufficient to support a § 1983 claim."  Lytle, 382 F.3d at 987; see also Haugen v. Brosseau,

21  351 F.3d 372, 393 (9th Cir. 2003).  A plaintiff must show "a 'conscious, affirmative choice' to

22  ratify the conduct in question."  Lassiter v. City of Bremerton, 556 F.3d 1049, 1055 (9th Cir.

23  2009).  Here, there is no evidence that a policy maker made a conscious affirmative choice to

24  endorse the conduct of the police officers.  The only evidence that arguably appears to support a

25  ratification theory is the opinion of Colson's expert, Roger Clark.  See Clark Dec. ¶ 33.  Clark

26  opined that the failure to retrain or change training showed ratification.  See id.  However,

27  Clark's opinion lacks a sufficient foundation, is an improper legal conclusion, and is contrary to

28  the legal requirements for ratifications as discussed in *Lytle* and *Lassiter*.

Because Colson has failed to show any basis for imposing *Monell* liability against the City, summary judgment on all *Monell* claims against the City is appropriate.

**V.     Fifth Through Twelfth Causes of Action – State Law Claims**

Defendants also request summary judgment on Colson's state law claims.  However, there are now no federal claims left in this case.  Jurisdiction in this case is based on the presence of a federal question, and the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  However, under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law claims if "the district court has dismissed all claims over which it has original jurisdiction."  Generally, "when federal claims are dismissed before trial . . . pendent state claims should also be dismissed."  Religious Tech. Ctr v. Wollersheim, 971 F.2d 364, 367-68 (9th Cir. 1992).

Here, considering judicial economy, convenience, fairness, and comity, and because summary judgment has been granted on all of Colson's federal claims, the Court will decline to exercise supplemental jurisdiction over Colson's remaining state law claims.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); City of Colton v. Am. Promotional Events, Inc.-West, 614 F.3d 998, 1008 (9th Cir. 2010) ("Because the district court did not err in granting summary judgment on the federal claims, it did not abuse its discretion in dismissing the state-law claims."); Religious Tech., 971 F.2d at 367-68.

**CONCLUSION**

Defendants move for summary judgment on all causes of action against them.

As to the first cause of action, summary judgment in favor of Park and Wright is appropriate because the evidence shows that these two officers did not handcuff or drag Colson.

As to the second cause of action, summary judgment in favor of Park and Wright is appropriate because the evidence shows that these two officers detained Colson in response to a facially valid request made by a superior in a radio broadcast.

As to the third cause of action, summary judgment in favor of Park and Wright is

appropriate because the evidence shows neither objectively unreasonable conduct or deliberate indifference in the failure to obtain medical care for Colson.

As to the fourth cause of action, summary judgment in favor of Park and Wright is appropriate because the evidence shows neither a violation of rights that resulted from an agreement or the existence of an agreement to violate rights.

As to the *Monell* claims embedded within the first, second, third, and fourth causes of action, summary judgment in favor of the City is appropriate on each of these causes of action because the evidence fails to show that any City policy, practice, or custom cause a violation of Colson's rights.

Finally, because the Court has dismissed all federal causes of action in this case, the Court declines to exercise supplemental jurisdiction over Colson's remaining state law claims.

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion for summary judgment on the first, second, third, and fourth causes of action is GRANTED;

2.    Pursuant to 28 U.S.C. § 1367(c)(3), the Court DECLINES to exercise supplemental jurisdiction over Plaintiff's state law claims, and those state law claims are DISMISSED without prejudice; and

3.    The Clerk shall CLOSE this case.

IT IS SO ORDERED.

Dated:    July 10, 2012    _____

CHIEF UNITED STATES DISTRICT JUDGE